John P. Aldrich
Nevada Bar No. 6877
**ALDRICH LAW FIRM, LTD.**
7866 West Sahara Avenue
Las Vegas, NV 89117
Tel:  (702) 853-5490
Fax:  (702) 227-1975
jaldrich@johnaldrichlawfirm.com

*Attorneys for Plaintiffs*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LEROY ATKINS and GERALDINE ATKINS, individually and on behalf of all those similarly situated, | Case No. |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| METLIFE, INC., METROPOLITAN LIFE INSURANCE COMPANY, and BRIGHTHOUSE FINANCIAL, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Leroy Atkins and Geraldine Atkins ("Plaintiffs"), individually and on behalf of all those similarly situated, file this class action complaint against MetLife, Inc., Metropolitan Life Insurance Company ("MLIC"), and Brighthouse Financial, Inc. ("Brighthouse") (collectively, "Defendants," the "Company," or "MetLife") and make the following allegations based upon personal knowledge as to themselves and their own acts, upon the investigation conducted by their attorneys, and upon information and belief.

## I.    INTRODUCTION

1.    This is a class action arising out of MetLife's acknowledged failure to timely contact, notify, and pay overdue annuity benefits and interest to retirees, depriving them of important income

- 1 -

in their golden years.  Plaintiffs are among an estimated 13,500 individuals who were denied more than $500 million in retirement benefits over the course of *25 years* by MetLife.

2.      Defendants' obligations to pay retirement benefits to these individuals arose from MetLife's "pension risk transfer" business in which MetLife, through its subsidiaries and affiliates, agreed to assume the risks and costs associated with managing traditional employer-provided defined benefit plans, also referred to as pension plans or retirement plans, covered under the Employee Retirement Income Security Act of 1974 ("ERISA").  As part of its pension risk transfer business, MetLife acquired the assets of these defined benefit pension plans and converted them into group annuity contracts ("GACs").

3.      GACs are contracts issued by insurance companies to ERISA-covered employee retirement plans which guarantee benefits to the participants covered under the plans.  Insurance companies market GACs as a "pension risk transfer" product because they offer employers a way to transfer liability for their employees' retirement assets.  Through the pension risk transfer process, employers close out their pension liabilities and plan participants become "annuitants" under the GACs, entitled to annuity payments when they reach retirement age.  The plan participants themselves are often unaware that their pension plan sponsor purchased a GAC.  Insurance companies like MetLife assume responsibility for notifying annuitants that their pension plans have transferred the administration of their benefits to an insurance company and providing annuitants with a group annuity certificate that describes the terms of the annuity and explains the annuity payments guaranteed by the insurance company.

4.      MetLife is required to keep in reserve sufficient funds to pay its future claims and liabilities pursuant to its GAC obligations.  MetLife has benefitted by systematically failing to pay retirement benefits to thousands of pension risk transfer annuitants it failed to locate and their

beneficiaries, a gross betrayal of trust.  The funds maintained for those beneficiaries[1] were then released from MetLife's reserves and became assets that increased MetLife's bottom line.

5.     MetLife, Inc. has admitted that over the course of **25 years**, it failed to locate more than 13,500 beneficiaries and released to itself over $500 million in annuity benefit reserves.  Instead of meeting their obligations under the GACs, Defendants abandoned their responsibilities and failed to keep track of beneficiaries, failed to maintain current contact information for them, and failed to timely notify and pay beneficiaries when they became entitled to their benefits.  When Defendants did attempt to contact beneficiaries, their attempts were half-hearted, and when those attempts predictably failed, Defendants deemed beneficiaries to be "deceased" and took for itself the reserves set aside to pay their benefits.  By releasing the funds held in reserve to itself, MetLife, Inc. exercised dominion and control over the benefits due to Plaintiffs and members of the Class (defined below) and benefitted by reducing its future pension benefit liabilities and increasing its retained earnings.

6.     In admitting that it failed to pay these annuity benefits, MetLife revealed additional details about its protocols and procedures regarding the payment of benefits to retirees—which apparently involved nothing more than sending two generic form letters to the annuitant's last known address, one letter when the annuitant turned 65, and a second letter as the annuitant approached age 70½.  If an annuitant did not respond after these two perfunctory attempts at contact, the Company assumed the annuitant had died.  Instead of attempting to locate and contact the annuitant's designated beneficiaries or escheat the unclaimed benefits to the state as the Company was required to do under unclaimed property laws, MetLife released the annuitant's benefit amount from the reserves to itself, decreasing the Company's liabilities and increasing its assets.

---

[1] The term "beneficiaries" refers to both former pension plan participants and their designated beneficiaries.

7.      The scope and scale of MetLife's betrayal of trust is particularly egregious considering that it comes on the heels of MetLife's failure to pay death benefits in connection with the Company's *life insurance* business.  This failure resulted in a 2012 multi-state regulatory settlement that required the Company to pay $500 million in overdue death benefits and to inspect its annuity business for similar flaws and deficiencies.  Notably, pension risk transfer annuitants were specifically carved out from the regulatory settlement's directive to MetLife to inspect its annuity business.  In other words, while MetLife took steps to improve its practices for paying benefits to annuitants under its own policies, it did not extend these efforts to pension risk transfer annuitants who did not know that MetLife assumed responsibility for paying them and are thus especially vulnerable to being disregarded or overlooked.

8.      Making matters even more egregious, on those occasions when MetLife was contacted by annuitants or their beneficiaries to inquire about potential benefits, MetLife would try to minimize their recovery, sending them confusing settlement forms for amounts calculated through an unexplained formula and which made unclear whether any accrued interest on the unpaid benefits was properly included in the amounts.  For those annuitants who are now deceased, MetLife's delay further benefitted the Company as survivor benefits to designated beneficiaries are only 50% of the amount to which the annuitants were entitled.  Upon information and belief, the benefit amounts furnished by MetLife usually represented a fraction of what was owed to annuitants and beneficiaries and the amounts either included no interest or interest calculated at a grossly inadequate rate, far below MetLife's average internal rate of return on its investment of these funds and far below the statutory interest rate in every state.  Requests by annuitants for information on how their benefits were calculated and for copies of the relevant GACs were ignored or rebuffed.  Notably, these tactics were used against retirees, many of whom are more than 70 years old.

9.      Even now, after admitting its failure and initiating "voluntary" efforts to locate and pay beneficiaries, MetLife continues to mislead these vulnerable victims.  For example, despite pledging to pay interest on back benefits to the annuitants MetLife failed to locate over the course of 25 years, the Company continues to try and minimize their recovery by sending settlement forms that fail to acknowledge that the annuity payments are late and that interest is owed.

## II.    PARTIES

### A.    Plaintiffs

10.     Plaintiff Leroy Atkins ("Mr. Atkins") is an individual residing in Pahrump, Nevada. Plaintiff Geraldine Atkins ("Mrs. Atkins," and together with Mr. Atkins, "Plaintiffs") is married to Mr. Atkins.  Plaintiffs have been married since 1961 and have lived in Nevada for the past 13 years.

11.     Mr. Atkins worked at Fairchild Camera and Instrument Company ("Fairchild Camera") for approximately six years, from 1963 to 1969.  Through his employment at Fairchild Camera, Mr. Atkins is an annuitant under Group Annuity Contract #092372 ("GAC 92372"), pursuant to which MetLife was responsible for paying annuity benefits to Mr. Atkins, at the latest, when he turned 65 in 2008.  Mrs. Atkins is the designated beneficiary of Mr. Atkins's pension benefits.

### B.    Defendants

12.     Defendant MetLife, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business located at 200 Park Avenue, New York, New York 10166.  MetLife, Inc.'s common stock trades on the New York Stock Exchange under the ticker "MET."  MetLife, Inc. is one of the world's largest financial service companies and, with its subsidiaries and affiliates, provides insurance, annuities, employee benefits, and asset management. As of the date of this Complaint, MetLife, Inc. has a market capitalization of over $45 billion. MetLife, Inc.'s subsidiaries and affiliates include Metropolitan Life Insurance Company ("MLIC").

13.     Defendant MLIC is a direct wholly owned subsidiary of MetLife, Inc. and is organized under the laws of the state of New York with its principal place of business located at 200 Park Avenue, New York, New York 10166, where it shares offices with its parent company, MetLife, Inc.  MLIC provides insurance, annuities, and other products and is licensed to transact business in all 50 states.  MLIC is an agent and/or alter ego of MetLife, Inc.  For example, before his departure earlier this year, Steven A. Kandarian was Chairman of the Board, President, and Chief Executive Officer ("CEO") of both MLIC and MetLife, Inc.  John D. McCallion is Executive Vice President and Chief Financial Officer of both MLIC and MetLife, Inc.  Tamara L. Schock is Chief Accounting Officer of both MLIC and MetLife, Inc.  According to MetLife, Inc.'s Definitive Proxy Statement (Schedule 14A) (Apr. 25, 2019), each of its Directors serves as a director of MLIC.

14.     Defendant Brighthouse Financial, Inc. ("Brighthouse") is a Delaware corporation with its headquarters in Charlotte, North Carolina.  Brighthouse is a publicly traded corporation listed on the NASDAQ under the ticker "BHF."  Brighthouse was formed by MetLife, Inc. in 2017 through the spinoff of MetLife, Inc.'s United States retail business, including individual life insurance and annuities for the retail market.  As part of the spinoff, Brighthouse assumed a substantial portion of MetLife, Inc.'s former retail business including legacy GACs that continue to be administered by MetLife, Inc. or MLIC.  MetLife, Inc. is Brighthouse's largest shareholder and owns 19.2% of Brighthouse's outstanding common stock.

15.     Unless otherwise specified, the term "MetLife," the "Company," or "Defendants" refers to MetLife, Inc., MLIC, and Brighthouse collectively.

III.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Plaintiffs are residents of Nevada.  Defendants MetLife, Inc. and Brighthouse are incorporated in the state of Delaware and have their principal places of business in the states of New

York and North Carolina, respectively. MLIC is a New York corporation with its principal place of business in New York.

17.     The amount in controversy is unknown but is believed to be in the hundreds of millions of dollars.

18.     This Court has personal jurisdiction over Defendants because they each do business in and have significant contacts with this District. MetLife, Inc. generally does business in this state. MetLife, Inc. subsidiary MLIC is licensed to do business in this state under the NAIC ID: 65978, License #401. Brighthouse, through its subsidiary Brighthouse Life Insurance Company, is licensed to do business in this state under the NAIC ID: 87726, License #653.

19.     This Court also has personal jurisdiction over Defendants pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 4(k)(1)(A) because they would be subject to jurisdiction of a court of general jurisdiction in this District.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because Plaintiffs are residents of this District, a substantial part of Plaintiffs' claims occurred in this District, and because each Defendant transacts business in, is found in, and/or has agents in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     MetLife is a Major Provider of Group Annuity Contracts

21.     MetLife is one of the largest financial services companies in the world and, through its network of subsidiaries and affiliates, provides its customers with insurance, annuities, employee benefits, and asset management products and services. MetLife's United States segment includes its Retirement and Income Solutions ("RIS") unit which oversees a line of business known as "pension risk transfers" through which MetLife assumes complete responsibility for all, or a portion of, payments due to participants in employer-sponsored pension plans.

22.     MetLife's pension risk transfer products turn employer-provided defined benefit pension plans into GACs.  When an employer or plan sponsor purchases a GAC, MetLife assumes responsibility for the employer's pension plan obligations including asset management, locating plan participants, and payment of the benefits to retirees.  The pension risk transfer process results in employers closing out their pension liabilities and plan participants becoming entitled to annuity payments pursuant to MetLife's GACs as they reach retirement age.

23.     Pension risk transfers have been a part of MetLife's business since 1921, when the Company issued its first GAC to fund a defined benefit plan.[2]  Wayne Daniel, head of MetLife's U.S. Pensions, has stated that this type of risk management has been a "core element" of MetLife's business for over 90 years, with the Company boasting a 45% share of the market for group annuities and similar risk mitigation strategies relevant to employee pension plans.[3]

24.     In addition to the benefits of risk management for employers, MetLife markets GACs based upon the perceived safety of these contracts and the guarantee that retirees would receive their annuity benefits in a timely and reliable fashion.  MetLife assures annuitants that they need not do "anything" in order to start receiving benefits and promises that "we are working with your company to make sure we have all the necessary information to get you your first payment on time."[4]

### B.     Group Annuity Contracts

25.     GACs are negotiated between MetLife and employers or plan sponsors and typically include details such as a description of benefits, contribution requirements, administrative fees, and a

---

[2] *See* Press Release, MetLife, *MetLife to Provide Pension Benefits to Approximately 41,000 FedEx Retirees and Beneficiaries* (May 8, 2019), https://www.metlife.com/about-us/newsroom/2018/may/metlife-to-provide-pension-benefits-to-approximately-41000-fedex/.

[3] Wayne Daniel, *Pension Perspective*, PlanSponsor (June 19, 2014), https://www.plansponsor.com/thought-leadership/pension-perspective/.

[4] Pensions Participant Center, MetLife, https://www.metlife.com/retirement-and-income-solutions/pension-risk/pensions-center/ (last visited Nov. 18, 2019) ("Pension Participant Center").

schedule for the payment of benefits to annuitants.[5]  Employers provide MetLife with information related to their employee benefit plans, which MetLife uses to administer the GACs and effect payments.  Under the GACs, MetLife agrees to assume complete responsibility for contacting former plan participants, calculating the amount of benefits due them, and making timely payments to the annuitants.

26.  Plan participants, including retirees, are not themselves party to the GACs, do not receive copies of the GACs, and are unaware that responsibility for the administration and payment of their retirement benefits has moved from their employer to MetLife.[6]  This means that many retirees do not even realize that they are eligible for annuity benefits—making them dependent on MetLife's good-faith diligence to notify them and to properly calculate the amounts owed to them. Even when plan participants are aware of or later learn that they are the beneficiary of a GAC, MetLife does not provide copies of these GACs to plan participants.  As some GACs may have been entered into decades ago with companies that are no longer in existence, MetLife's unwillingness to supply copies of the GACs leaves plan participants with no way to determine the terms of the relevant GACs, how benefits were calculated by MetLife, and the entire amount to which they are entitled.  MetLife's apparent indifference to contacting plan participants left thousands of retirees without well-deserved and much-needed retirement benefits and the Company's recalcitrance in providing annuitants with information on the rules of eligibility deprived—and continues to deprive—retirees of the full amount of money they are due.

27.  For example, although MetLife maintains that Mr. Atkins's annuity benefits are governed by GAC 92372 (according to correspondence to Mr. Atkins from Brighthouse), the

---

[5]  *See* Dennis Myhre, *Which 401k Plan is Best for You?* Fiduciary Factor (Feb. 12, 2019), https://fiduciaryfactor.com/which-401k-plan-best-you/; Gail Sessions, *What Is a Group Annuity?* Zacks, https://finance.zacks.com/group-annuity-8257.html.

[6]  The GACs themselves are issued on behalf of MetLife by MLIC or other MetLife, Inc. subsidiaries. Pensions Participant Center, MetLife.

Company has steadfastly refused to provide a copy of the relevant contract to both Plaintiffs and their counsel, despite repeated demands.

28.     Upon information and belief, the terms of the GACs issued by MetLife (including GAC 92372) are uniform with respect to MetLife's obligation to timely contact and notify annuitants about the benefits to which they are entitled and to making timely payment of those benefits including accrued interest.   GACs are designed to guarantee pension benefits to qualified participants upon retirement and the initiation of payments is usually tied to annuitants' birthdays upon reaching retirement age.   Indeed, in their investigation, counsel for Plaintiffs have obtained a copy of a MetLife GAC for a different plan sponsor that stipulates that retirement benefits will commence on the first day of the month that coincides with the retiree's 65th birthday.   This is consistent with admissions by MetLife that, historically, the Company sent letters to annuitants as they approached their 65th birthday (MetLife's definition of normal retirement age) and a second time when they approached age 70½ (MetLife's required minimum distribution age).   The GAC obtained by Plaintiffs' counsel also requires MetLife to provide participants with a certificate outlining the benefits under the GAC.

29.     Pursuant to the terms of the GACs, insurance companies like MetLife have complete discretion with regard to establishing and implementing policies, practices, and procedures for identifying, locating, and contacting beneficiaries and making annuity payments.   GACs do not specify terms regarding, for example, the specific steps the Company is required to take to keep track of and search for beneficiaries, the means MetLife is obligated to utilize to communicate with beneficiaries, the methods MetLife is required to follow to ensure payments are made on a timely basis, and the consequences when MetLife fails to meet its obligations under the contract.   Rather, MetLife maintains discretion with regard to those terms.

30.     GACs are fully funded at inception.   As part of the pension risk transfer process, when an employer or plan sponsor purchases a GAC, MetLife establishes a liability (i.e., an accounting reserve) to account for the full estimated future policy benefits that are to be paid to annuitants under the GACs (the former plan participants).   MetLife is contractually and legally required to maintain adequate funds in its pension reserve accounts to pay future claims pursuant to its GAC obligations and which the Company cannot use for its own gain.   These reserves constitute liabilities of the Company.   When an annuitant dies, MetLife no longer has to maintain reserves for that person and can release that portion of the reserves that had been set aside to fund the future benefits payable to that beneficiary.   By releasing the reserves established to pay retirees under the GACs to MetLife's own accounts when it presumes annuitants to be deceased, MetLife decreases its liabilities and inflates its assets and benefits thereby.   MetLife, Inc. admitted to improperly releasing over $500 million in reserves set aside to pay annuity benefits to thousands of retirees and correspondingly reducing its liabilities.

**C.     MetLife Failed to Carry Out its Obligations Under the GACs**

31.     Despite its obligations under the GACs to maintain current contact information for annuitants and timely administer their benefits, MetLife in fact took few, if any, actions to fulfill its duties.   For at least 25 years, MetLife's protocols, processes, and procedures for carrying out its obligations under GACs were designed to benefit the Company at the expense of beneficiaries.   MetLife's failure to meet its responsibilities has resulted in thousands of retirees being denied their benefits.   MetLife admitted to "losing track" of at least 13,500 beneficiaries.   The Company presumed these individuals were deceased and released their benefits from MetLife's pension reserve accounts.   In this way, MetLife, Inc. boosted its earnings by, in the aggregate, over $500 million while retirees were left without important retirement income.

32.    This money is needed.  The estimated median annual household income among retirees is $32,000 and more than half of retirees (53%) live on less than $50,000.[7]  Many retirees face formidable challenges in ensuring that they have adequate income to last their lifetimes.[8]  "Financially speaking, living on such limited means is not easy," says Catherine Collinson, president of Transamerica Center for Retirement Studies.[9]  In fact, 42% of retirees say that they are having difficulty making ends meet.  "I think for the 'average' American household, $32,000 is doable but will likely result in changes in lifestyle that will be significant for some households." says David Blanchett, head of retirement research for Morningstar Investment Management.[10]  For those retirees whose sole source of income is Social Security benefits, the so-called golden years are even more daunting.  The average monthly Social Security retirement benefit was recently calculated at $1,471.[11]  That amounts to only $17,652 per year.  To put that into perspective, the federal poverty line in the United States for a single person household is an annual income of $12,490.[12]

33.    Annuitants are generally not notified when their benefits are transferred from their employer or plan sponsor to an insurance company pursuant to a GAC.  Although MetLife assures that beneficiaries will be provided with a group annuity certificate describing their benefits,[13] retirees

---

[7] Robert Powell, *Could You Live on Just $32,000 Per Year? Most Retirees Do,* USA Today (July 16, 2016), https://www.usatoday.com/story/money/columnist/powell/2016/07/14/retirees-low-income-social-security/83934392/.

[8] *See A Precarious Existence: How Today's Retirees are Financially Faring in Retirement*, Transamerica Center for Retirement Studies (Dec. 2018), https://www.transamericacenter.org/docs/default-source/retirees-survey/tcrs2018_sr_retirees_survey_financially_faring.pdf.

[9] Powell, USA Today (July 16, 2016).

[10] *Id.*

[11] Emily Brandon, *What is the Maximum Possible Social Security Benefit in 2019?* U.S. News & World Report (Aug. 5, 2019), https://money.usnews.com/money/retirement/social-security/articles/what-is-the-maximum-possible-social-security-benefit.

[12] *HHS Poverty Guidelines for 2019*, ASPE, https://aspe.hhs.gov/poverty-guidelines (last visited Nov. 18, 2019).

[13] MetLife promises annuitants that it will provide them with "an insurance certificate describing your benefits, along with the information we have for you."  Pensions Participant Center, MetLife.

including Mr. Atkins never received such a certificate.  And despite MetLife's assurances that beneficiaries need not do "anything" in order to start receiving annuity payments, the Company has admitted that its attempts to notify and contact annuitants about their benefits when they reached retirement age were perfunctory and inadequate.

34.     MetLife's practice was to send out two letters to an annuitant's last known address, one letter as the annuitant approached age 65, and a second letter as the annuitant approached age 70½.  If the annuitant did not respond to the first letter, MetLife determined that the annuitant had chosen to defer receipt of benefits beyond the normal retirement date.  MetLife made no further inquiry and did not take any additional steps to contact beneficiaries and verify their election. MetLife did not require any affirmative confirmation from beneficiaries that they had elected to defer collection of their retirement benefits.  As retirees approached age 70½, MetLife sent a second and final letter to the annuitant.

35.     In the absence of a response to this second letter, MetLife categorized an annuitant as "presumed dead."  That is, MetLife's annuity database was programmed to assume death at age 70½ if the annuity had not been claimed.  MetLife did not check public death files and did not attempt to reach retirees by any other means, including certified mail, electronic mail, or telephone.  MetLife did not even attempt to verify that it had the correct address on file for retirees even if the letters came back as undeliverable.  Further, upon presuming the death of the annuitant, MetLife made no attempt to contact designated beneficiaries of the annuitant, and MetLife did not escheat the unclaimed annuity benefits as required under state unclaimed property statutes.

36.     Further demonstrating MetLife's disregard for retirees and indifference for the obligations owed to them, MetLife sent its letters to the addresses received from the annuitants' pension plan sponsors at the time MetLife acquired the pension obligations under the GACs. MetLife took no steps to maintain contact with group annuitants between the time that MetLife

assumed responsibility for their pension benefits and when the annuitants neared age 65. Even though the time elapsed could be years or even decades, MetLife did not attempt to verify or update addresses on file for retirees. Some retirees who had remained at the same address never received any notices from MetLife regarding their pension benefits, a strong indication that the notices had never been sent at all.

37. The two perfunctory letters sent by MetLife were vague, misleading, and unclear about the purpose of the communication. Far from informing beneficiaries about the benefits they are due, the notices resembled form letters that could easily be mistaken as junk mail. Even if the letters were received by a beneficiary, the generic notices merely state that the annuitant had reached 65 or 70½ years of age and "may be eligible for retirement benefits" (similar to phrases such as "you may already be a winner" which pervades solicitations delivered by mail) and refer them to a toll-free number for the Company's "Customer Sales and Service Group" or "Customer Response Center" for further information. There is no mention of the past due amount owed to the annuitant, the interest on that amount, or any further explanation for why they were getting the notice. Under these circumstances, it is highly unlikely that retirees understood why they were being contacted by MetLife in the first instance. The form letters did not make clear the connection between MetLife, the retirees' former employers, and pension benefits, something MetLife could have easily done but chose not to.

38. In the instances where a beneficiary actually contacted MetLife to inquire about the details of their benefits or demanded information for the basis of MetLife's calculation of their benefit amounts, they were met with incessant delays, stonewalling, and bureaucratic obstacles, reflecting a uniform practice of refusing to provide meaningful information to annuitants and a strong indication that the Company's policy was to minimize the benefits it paid to retirees. When

the Company finally did respond, it remained silent as to whether the beneficiaries were owed interest or even that the payments were late.

39.     After making inadequate and insufficient efforts to notify retirees about their entitlement to annuity payments under the GACs, MetLife presumed the annuitants it failed to contact were deceased and released the full reserves for benefits associated with the annuitants, which eliminated the liability from MetLife, Inc.'s balance sheet, and caused a commensurate increase in MetLife, Inc.'s reported surplus, reflected in financial reports as profits.  MetLife, Inc. admitted that over the course of 25 years, it released over $500 million in reserves associated with annuity obligations owed to thousands of pension risk transfer beneficiaries to the exclusion of the rights of Plaintiffs and the Class.  In this way, MetLife, Inc. used reserve assets, established under the GACs to make annuity payments, for its own benefit and exercised dominion and control over the funds which were the property of the beneficiaries.

**D.    A Promise Broken—13,500 Retirees Do Not Receive Their Benefits**

40.     During after-market hours on December 15, 2017, MetLife announced, buried at the end of a press release issued on a Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") that its much touted GAC retirement products had failed to pay annuity benefits to as many as 30,000 retirees:[14]

> *... MetLife has been in the retirement business for many decades.  As practices have evolved, we are improving the process used to locate a small subset of our total group annuitant population of approximately 600,000 that have moved jobs, relocated, or otherwise can no longer be reached via the information provided for them.*  ***We currently believe the portion of the subset that is most impacted is less than 5% of our total group annuitant population and they tend to be smaller size cases with average benefits of less than $150 per month.***[15, 16]

---

[14] Although the Company originally disclosed that "less than 5%" of its 600,000 participants, i.e., approximately 30,000 retirees, had not received benefits, in a subsequent Form 8-K filed on February 13, 2018, MetLife, Inc. stated that the number of group annuity participants affected is about 13,500.

[15] All emphasis is added unless otherwise indicated.

41.     Industry analysts and consumer advocates alike were stunned.  *The Wall Street Journal* reported that MetLife's failure to pay annuity benefits had been ongoing for a long time and noted its similarity to the practices that were uncovered in an investigation into the Company's failure to pay overdue death benefits:

> *Some Wall Street analysts assumed that the payments could be 10 or more years overdue.  At $150 a month for 30,000 people—5% of the 600,000—over 10 years, that could be up to $540 million.*

*     *     *

> *The company's disclosure recalls a scandal that played out across a large part of the life-insurance industry in recent years when state insurance regulators identified that there were billions of dollars of overdue life-insurance policies on insurers' books.*

> *In 2012, MetLife agreed to pay $40 million to settle a multistate probe of its handling of death benefits, in a deal that was expected to pay more than $400 million to heirs of life-insurance policyholders.[17]*

42.     An article published in *Pension & Investments* included a statement from MetLife admitting, "While it is still difficult to track everyone down, **we have not been as aggressive as we could have been**."[18]  The Company pledged to "implement[ ] enhanced techniques within MetLife's retirement and income solutions business to better locate and promptly pay any group  annuitant who may be entitled to benefits," and promised to **"promptly pay anyone we find**."[19]

43.     A little more than a month after MetLife's December 15, 2017 press release, the Company further announced that as a result of its colossal failure:

---

[16] Noting that the owed benefits would be generally less than $150 per month to downplay the seriousness of the problem ignores the fact that $150 per month could be a substantial amount for a retiree.  For example, $150 per month would represent at least a 10% increase in income for an average retiree receiving only Social Security benefits.

[17] Leslie Scism, *MetLife Discloses Failure to Pay Thousands of Workers' Pensions*, The Wall Street Journal (Dec. 15, 2017), https://www.wsj.com/articles/metlife-discloses-failure-to-pay-thousands-of-workers-pensions-1513381145.

[18] Rob Kozlowski, *MetLife Discloses it Failed to Pay Benefits to Some Retirees From Annuity Buyouts*, Pension & Investments (Dec. 18, 2017),  https://www.pionline.com/article/20171218/ONLINE/171219824/metlife-discloses-it-failed-to-pay-benefits-to-some-retirees-from-annuity-buyouts.

[19] *Id.*

- 16 -

> [T]he prior release of group annuity reserves resulted from a material weakness in internal control over financial reporting. MetLife expects to increase reserves in total between $525 million and $575 million pre-tax, to adjust for reserves previously released, as well as accrued interest and other related liabilities.[20]

44.     The Company's inability to locate and pay pension risk transfer beneficiaries forced MetLife, Inc. to revise its prior financial statements. The inflated financial results in MetLife, Inc.'s sworn annual statements were materially false, compromising both risk-based capital ("RBC")[21] and reported surplus.[22] MetLife attributed its failure to pay annuity benefits on its inability to locate "unresponsive and missing international group annuity annuitants and pension beneficiaries" suggesting that MetLife had been aware of the problem for some time. In other words, MetLife blamed the annuitants for its mishandling of their accounts.

45.     On February 14, 2018, Steven A. Kandarian, Chairman of the Board, President, and CEO, of MetLife, Inc., shed further light on the scope of the Company's failure during its fourth quarter ("Q4") 2017 earnings call, which he opened with a public apology:

> Simply put, this is not our finest hour. We had an operational failure that never should have happened, and it is deeply embarrassing. We are undertaking a thorough review of our practices, processes and people to understand where we fell short and how we can reset the bar at the high-level people have come to expect from us over our 150-year history.[23]

---

[20] Press Release, MetLife, *MetLife Preannounces Preliminary Fourth Quarter 2017 Earnings, Reschedules Earnings Release and Conference Call* (Jan. 29, 2018), https://www.metlife.com/about-us/newsroom/2018/january/metlife-preannounces-preliminary-preliminary-fourth-quarter-2017-earnings--r/. In addition to admitting to investors that a material weakness in the Company's internal control over financial reporting allowed MetLife, Inc. to understate its accounting reserves by over $500 million, the Company announced that it intended to make revisions and corrections to prior financial reports to reflect the adjusted earnings for those periods as required by accounting standards.

[21] RBC is a method of measuring the minimum amount of capital appropriate for a reporting entity to support its overall business operations in consideration of its size and risk profile. *Risk Based Capital*, NAIC (May 23, 2019), https://www.naic.org/cipr_topics/topic_risk_based_capital.htm.

[22] MetLife, Inc. disclosed in its 2018 Annual Report on Form 10-K filed with the SEC on February 22, 2019 ("2018 Form 10-K"), a pending class action lawsuit alleging that the Company violated of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, by issuing materially false and/or misleading financial statements regarding MetLife, Inc.'s practices and procedures for estimating group annuity reserves. MetLife, Inc. also disclosed that a shareholder seeking to sue derivatively on behalf of MetLife, Inc. commenced an action in federal court against the Company's Board of Directors for breach of fiduciary duty, gross mismanagement, waste of corporate assets as well as securities fraud claims. Since filing its 2018 Form 10-K, additional derivative actions were filed against MetLife, Inc.'s Board stemming from MetLife's illegal and improper pension risk transfer practice.

[23] MetLife, Inc., Q4 2017 Earnings Call Transcript (Feb. 14, 2018).

46.     What followed this *mea culpa* laid bare MetLife's malfeasance and ongoing disregard of pension risk transfer beneficiaries, all of whom "are already retired and in pay status."[24] Kandarian admitted that "[i]n the 1990s, MetLife established a practice of releasing reserves when the company could not establish contact with an annuitant.  In retrospect, based on the process we had in place, this was an error."  In other words, MetLife's systemic failure to pay retirement benefits to GAC beneficiaries has been going on for approximately **25 years**, and inured to the benefit of MetLife, Inc.

47.     Kandarian assured that MetLife has taken steps to strengthen its process for finding "unresponsive and missing annuitants":

> *These include additional mailings, certified mailings, phone calls and the use of additional third-party firms specializing in locating missing participants.  For everyone we find, we will commence payments as soon as they elect to start their benefits.  **We'll also pay interest on back payments for those we find**.[25]*

48.     In total, Kandarian announced that the Company would take a pre-tax reserve charge of $510 million due to the unpaid benefits—slightly below MetLife's estimate of $525 million to $575 million in the Company's January 29, 2018 press release.

49.     Following MetLife's announcement, William F. Galvin, the Secretary of the Commonwealth of Massachusetts, launched an investigation into the Company's failure to pay retirement benefits to Massachusetts retirees.  Unlike MetLife, Massachusetts was quickly able to identify correct addresses for a majority of the unpaid beneficiaries in Massachusetts and determined that the average age of the "missing" beneficiaries in Massachusetts is 72.  According to Galvin, "approximately half of these seniors were still living at the same address MetLife had on file for them for the entire time MetLife failed to make payments to people they had so callously designated

---

[24] *Id.*

[25] *Id.*

as 'presumed dead.'"[26]  MetLife was publicly censured and ordered, pursuant to a consent order, to pay a $1 million fine—among the higher end of fines leveled by the Massachusetts Securities Division.

50.     Maria T. Vullo, Superintendent of the New York Department of Financial Services ("DFS"), similarly launched an investigation and announced earlier this year, in January 2019, that MetLife will pay a $19.75 million penalty and provide $189 million in restitution for failing to properly locate and pay benefits to thousands of beneficiaries in New York.[27]

51.     In April 2018, two months following the Q4 2017 earnings call, the Company announced that it was cutting the pay of both Kandarian and John C.F. Hele, MetLife, Inc.'s Executive Vice President and Chief Financial Officer, citing "[poor] performance in managing financial matters, including material weaknesses in internal control over financial reporting."[28]  Less than a week later, on May 1, 2018, MetLife announced that Hele had been replaced.  On January 8, 2019, the Company announced that Kandarian was to be replaced as CEO and Chairman of the Board, effective April 30, 2019.  In describing Kandarian's departure, articles from *The Wall Street Journal* and *Bloomberg* referenced the Company's failure to adequately search for and compensate pension risk transfer beneficiaries.[29]

/ / /

---

[26] John Manganaro, *MetLife Accused of Failing to Pay Retirees Covered by Pension Risk Transfers,* PlanSponsor (June 25, 2018), https://www.plansponsor.com/metlife-accused-failing-pay-retirees-covered-pension-risk-transfer/.

[27] Press Release, New York State, *DFS Superintendent Vullo Announces That MetLife Will Pay a $19.75 Million Fine and Provide $189 Million in Restitution to Policyholders for Failures Related to Pension Benefit Transfer* (Jan. 29, 2019), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1901282.

[28] MetLife, Inc., Definitive Proxy Statement (Schedule 14A) (Apr. 26, 2018).

[29] *See* Leslie Scism, *MetLife CEO Steven Kandarian to Retire in April*, The Wall Street Journal (Jan. 8, 2019), https://www.wsj.com/articles/metlife-ceo-steven-kandarian-to-retire-in-april-11546953417?mod=searchresults&page=1&pos=6; Lananh Nguyen and Katherine Chiglinsky, *MetLife Names Khalaf Chief Executive After 19% Stock Slump; CEOs with Global Flair Underpin MetLife, Prudential Push Abroad*, Bloomberg (Jan. 8, 2019), https://www.bloomberg.com/news/articles/2019-01-08/metlife-names-khalaf-ceo-replacing-kandarian-after-stock-slump.

**E.    MetLife Failed to Pay Mr. Atkins's Annuity Benefits**

52.    Mr. Atkins lives in Pahrump, Nevada with his wife of 58 years.  As a result of his previous employment with Fairchild Camera, Mr. Atkins is a beneficiary of a MetLife GAC.  Mr. Atkins was entitled to, and MetLife was responsible for paying, certain annuity benefits upon reaching the retirement age of 65 in March 2008.

53.    Mr. Atkins first received a notice from MetLife at the end of 2017, nine years after reaching retirement age, informing him that Brighthouse had assumed MetLife's retail business, including individual life insurance and annuities.  Although the Atkinses have resided in Nevada for the past 13 years, the notice was sent to Mr. Atkins's previous residence in California and did not mention any connection to Mr. Atkins's former employer or to his retirement benefits.  Almost a year later, in late 2018, Mr. Atkins received a letter from Brighthouse, this time informing him that he "may be eligible for retirement benefits."  At the time, Mr. Atkins was 75½ years old.

54.    Soon after receiving this notice, the Atkinses called MetLife's Customer Response Center to request information on how Mr. Atkins's benefits were calculated and for copies of the relevant plan documents.  MetLife responded by form letter with a "Benefit Election" form that identified a monthly "Straight Life Annuity" benefit amount of $16.25 with no further explanation. The subject line of the letter identified "Texas Commerce Bank, N.A. as Trustee for Fairchild Camera an" [sic] and referenced GAC 92372.  The form letter contained no other information regarding GAC 92372 or its terms and provisions.[30]  Also lacking in that correspondence was any acknowledgement that MetLife's payment of annuity benefits to Mr. Atkins was ten years late. MetLife did not provide any basis whatsoever for Mr. Atkins to verify the amount owed to him, and MetLife did not acknowledge that Mr. Atkins was owed interest or other additional consideration. ///

---

[30] The letter Mr. Atkins received also references a "10 year C&C option" that has "expired" with no further explanation.

**F.    MetLife Refuses to Produce Group Annuity Contract 92372**

55.    The Atkinses have made repeated requests to MetLife for an explanation of how Mr. Atkins's benefit amount was calculated and for the relevant plan documents including a copy of GAC 92372.  Each time, MetLife responded by sending the same form letter enclosing the same Benefit Election form.  Attempts by Plaintiffs' attorneys to obtain the information were met with similar stonewalling, revealing that MetLife has uniformly trained its customer service representatives not to disclose any information concerning the calculation of annuity amounts or the terms of the underlying plans and GACs.

56.    In early February 2019, attorneys for Plaintiffs sent a certified letter to MetLife requesting all documents related to Mr. Atkins's overdue pension benefits including GAC 92372.  A copy of a power of attorney signed and notarized by Mr. Atkins was enclosed.  In March 2019, a representative from MetLife left a voicemail for Plaintiffs' attorneys stating that the power of attorney form was illegible.  The representative did not clearly identify himself and did not leave any contact information.

57.    Using the caller identification number captured from the voicemail, Plaintiffs' attorneys contacted MetLife and spoke to a customer representative in MetLife's pension department.  The representative firmly stated that MetLife had no record of GAC 92372 or Mr. Atkins's former employer Fairchild Camera.  At counsel's insistence, the representative eventually transferred the call to a call center supervisor located in Rhode Island.[31]  The supervisor was able to confirm that Mr. Atkins was an annuitant under GAC 92372 and that he was not yet "in pay" status. On the supervisor's instructions, counsel emailed a scanned copy of Mr. Atkins's power

---

[31] MetLife's RIS business, the line of business at the heart of Plaintiffs' allegations regarding MetLife's failure to identify unresponsive and missing annuitants and pension beneficiaries, houses specialists that provide services from MetLife's call center in Warwick, Rhode Island. *See Press Release, MetLife, MetLife's Retirement & Income Solutions Customer Solutions Center Receives Second J.D. Power Certification for Customer Service (July 28, 2017),* https://www.metlife.com/about-us/newsroom/2017/july/metlife-retirement-income-solutions-customer-solutions-center/.

of attorney to an undesignated general email address at MetLife and remained on the line until the supervisor confirmed receipt.[32]  After initially rejecting the duly signed and notarized power of attorney as unacceptable, the call center supervisor stated that a member of MetLife's administrative team[33] had given approval to accept the power of attorney.  The supervisor acknowledged that the power of attorney was valid and covered the requested documents but stated that MetLife could not provide any information on the calculation of Mr. Atkins's benefits nor furnish a copy of GAC 92372 due to confidentiality concerns.  After counsel pointed out that any sensitive information could be redacted, the supervisor then stated that MetLife would only *consider* providing the GAC and other benefit information upon receipt of an *unlimited general durable* power of attorney on behalf of Mr. Atkins and, even in that instance, the request would need to be passed on to a MetLife pension benefits administrator in Alpharetta, Georgia *for consideration*.  The supervisor refused to provide direct contact information for the administrative team and the pension benefits administrator and remarkably maintained that MetLife's legal department was unreachable by anyone in the call center.

58.    The supervisor stated that without an *unlimited general durable* power of attorney, the only information MetLife could provide was the Benefit Election form previously sent in response to the Atkinses' requests for information.  However, even then, the supervisor stated that any correspondence would be sent to the old California address MetLife has on file for Mr. Atkins despite being informed that Mr. Atkins has lived in Nevada for the past 13 years.

59.    Moreover, even if Mr. Atkins agreed to execute an unduly broad and unnecessarily expansive *unlimited general durable* power of attorney, the supervisor's instructions on submitting

---

[32] The supervisor stated that the system logging incoming documents had generated 6,000 emails just in the short time waiting to confirm receipt of the power of attorney.

[33] According to the supervisor, the administrative team is located outside the call center and handles the administration of benefits under GACs.  The call center supervisor stated that the administrative team works closely with MetLife's legal department.

the form to MetLife were unreasonably bureaucratic and opaque. Specifically, the supervisor instructed counsel to email the *unlimited general durable* power of attorney to the same undesignated general email address used previously and merely trust that MetLife would follow up appropriately. Plaintiffs and counsel would have no way to confirm receipt of the power of attorney, ensure that MetLife's review of the form was proper, and monitor MetLife's processes and procedures for complying with Plaintiffs' and counsel's requests for information. The supervisor refused to provide counsel with direct contact information. The only point of contact available to Plaintiffs and counsel was MetLife's general toll-free number.

60.     Although MetLife contends that Mr. Atkins's annuity benefits are governed by GAC 92372, MetLife has steadfastly refused to provide a copy of the relevant GAC.

**G.    MetLife—A Repeat Offender**

61.     As noted by *The Wall Street Journal*, this was not the first time that MetLife has been caught failing to pay out benefits. In 2009, MetLife became the target of government investigations for unfair and deceptive trade practices regarding non-payment of *life insurance* benefits. MetLife's lack of alacrity in identifying and correcting its failure with respect to *life insurance* benefits foreshadowed its continuing failure to promptly pay *annuity* benefits.

62.     Specifically, MetLife was the subject of a three-year multi-state investigation that centered on accusations that the Company "lost track" of thousands of deceased individuals with MetLife life insurance policies and retained unclaimed life insurance payouts. During the course of the investigation, MetLife admitted that while the Company routinely used the Social Security Administration Death Master File ("SSA-DMF") database to determine whether an annuitant had died so that they could stop paying retirement benefits, it was not using the SSA-DMF to identify deceased life insurance policyholders and pay their beneficiaries.

63.     Further underscoring MetLife's use of the SSA-DMF database only when it benefitted its own interests, the Company could have easily used the database to confirm whether pension risk transfer beneficiaries who did not respond to the two perfunctory form letters were, in fact, deceased.   Instead, MetLife simply presumed death for any unresponsive annuitants and released the reserves backing outstanding obligations to these retirees to its own benefit—displaying a shocking disregard for the duties MetLife assumed under its GACs and demonstrating an egregious breach of trust.

64.     MetLife has profited from these unpaid benefits.  When asked about MetLife's failure to pay death benefits, Jack Stollsteimer, director of Pennsylvania's Bureau of Unclaimed Property, commented: "If they're holding it, they're earning a profit on that money, because they're investing it …. Whether it was illegal or not, it was certainly dishonorable.  The people who bought these policies bought them because they trusted MetLife to pay their beneficiaries when they died."[34]

65.     MetLife settled the unpaid death benefits matter in 2012 by entering a regulatory settlement and agreeing to pay at least 22 states, including California, Florida, Illinois, Pennsylvania, New Hampshire, and North Dakota a total of $40 million (the "2012 Regulatory Agreement").[35]  A spokesman for MetLife said the Company expected to distribute about $188 million in overdue death benefits in 2012 and that over the next 17 years it might distribute as much as $438 million in additional overdue death benefits.[36]  Significantly, this means that MetLife was making payments pursuant to the 2012 Regulatory Agreement while it continued employing inadequate practices to

---

[34] Mary Williams Walsh, *MetLife Settles Cases on Benefits*, The New York Times (Apr. 23, 2012), https://www.nytimes.com/2012/04/24/health/policy/metlife-settles-cases-on-benefits.html

[35] *See* Missouri Department of Insurance, Regulatory Settlement Agreement (June 12, 2012), https://insurance.mo.gov/CompanyAgentSearch/search/documents/MetLifeSettlementAgreement.pdf, for a copy of the 2012 Regulatory Agreement.

[36] Walsh, New York Times (Apr. 23, 2012).

locate pension risk transfer beneficiaries and improperly releasing the reserves for the beneficiaries the Company failed to locate.

66.     As part of the 2012 Regulatory Agreement, MetLife agreed to conduct a "Thorough Search," including the use of certified mail, electronic mail, the telephone, and online databases, to identify and contact life insurance beneficiaries.[37]   While these efforts were extended to pension recipients under MetLife's own annuity contracts, pension risk transfer beneficiaries were specifically excluded from the 2012 Regulatory Agreement.[38]   In other words, as MetLife was improving its location practices for life insurance beneficiaries and other annuitants, for retirees like Mr. Atkins, the Company deliberately kept in place the same ineffective two-letter practice that the 2012 Regulatory Agreement was designed to remediate and that MetLife knew was inadequate.[39]

67.     MetLife had numerous opportunities to identify and correct its flawed protocols and processes for paying pension risk transfer beneficiaries.  In addition to the multi-state investigation of unpaid death benefits, MetLife was put on notice that it had systemic problems with the monitoring of beneficiaries as far back as 1996 when, upon information and belief, MetLife conducted a "complete internal audit" of the Company's annuity business.  This audit included GACs purchased by employers and should have detected systemic problems with the payment of group annuity benefits.

68.     MetLife was also on notice due to an investigation by the U.S. Department of Labor ("DOL").   According to *The Wall Street Journal*, beginning in 2013, the DOL's office in

---

[37] 2012 Regulatory Agreement, §§ 1(q)(i)-(v), 2(f)(i)-(ii).

[38] *See* 2012 Regulatory Agreement, at 3 (defining "Annuity Contract" to mean "a fixed or variable annuity contract other than a fixed or variable annuity contract issued to fund an employment-based retirement plan where MetLife is not committed by the terms of the annuity contract to pay death benefits to the beneficiaries of specific plan participants").

[39] Notably, the consent orders entered by MetLife as a result of the investigations by the Massachusetts Securities Division and by the New York DFS required MetLife to adopt many of the practices for locating missing pension risk transfer beneficiaries that the Company had been forced to undertake for other annuitants and for life insurance beneficiaries as part of the 2012 Regulatory Agreement.

Philadelphia began receiving complaints from retirees who were not receiving their pensions from MetLife.[40] By 2015, the DOL's Philadelphia office opened an investigation into the matter. In light of the DOL's investigation, MetLife launched an internal pilot program in August 2016 to examine the issue (the "Pilot Program"). The Pilot Program involved using additional data sources to locate missing pension risk transfer beneficiaries beyond the Company's standard practice of sending two perfunctory form letters and then presuming death when there was no response. Shockingly, the Pilot Program determined that 42% of the sample population of missing annuitants were improperly presumed deceased, underscoring the gross inadequacy of MetLife's policies and procedures.[41] *The Wall Street Journal* reported that the results of the Pilot Program contributed to the Company's decision to disclose that MetLife's processes and practices for locating pension risk transfer annuitants "were not as aggressive or robust as they needed to be."[42]

69.     Additionally, in September 2016, the Audit Committee of MetLife, Inc.'s Board of Directors was presented with an internal auditor's report that stated that MetLife's internal controls "over several areas, including contract accuracy, manual certificate mailings, and retirement letter mailings (e.g. age 65 and 70.5)" experienced "control weaknesses."[43] Despite MetLife's knowledge of material internal control weaknesses related to pension risk transfers, the Company failed to promptly follow up to ensure that the control weaknesses were remedied.[44]

---

[40] Leslie Scism and Heather Gillers, *MetLife Hires Outside Firms to Help Find Thousands of Workers Owed Pensions*, The Wall Street Journal (Dec. 21, 2017), https://www.wsj.com/articles/metlife-hires-outside-firms-to-help-find-thousands-of-workers-owed-pensions-1513857600.

[41] Although MetLife has never publicly disclosed the number of pension risk transfer annuitants identified by the Pilot Program who were improperly presumed as deceased, allegations in a derivative complaint based, in part, on books and records MetLife produced pursuant to 8 Del. C. § 220 ("Section 220"), revealed additional details about the Pilot Program. *See* Consolidated Verified Stockholder Derivative Complaint, *In re MetLife, Inc. Derivative Litig.*, No. 2019-0452-SG (Del. Ch. Sept. 16, 2019) ("Stockholder Derivative Complaint").

[42] Scism and Gillers, The Wall Street Journal (Dec. 21, 2017).

[43] *See* Stockholder Derivative Complaint ¶¶ 16, 127, 130.

[44] *Id.* at ¶ 133.

70.      Moreover, in January 2016, the estate of a former employee of Martindale-Hubbell, Inc. ("Martindale-Hubbell") who retired in 1994 brought a FINRA arbitration proceeding against MetLife for non-payment of benefits pursuant to a GAC.[45]  According to the FINRA Statement of Claims, William P. Toland, Sr. ("Mr. Toland") was the beneficiary of Group Annuity Contract #451 ("GAC 451") through his former employment with Martindale-Hubbell.   After working for Martindale-Hubbell for 34 years, Mr. Toland retired in February 1994 at the age of 68.   Under the terms of GAC 451, his annuity payments were to commence upon his retirement, at the latest by April 1994.  However, Mr. Toland was unaware that he was a beneficiary of GAC 451 and was first notified by MetLife that he was eligible for annuity benefits in September 2012—*18 years after his retirement*.[46]  Mr. Toland passed away in March 2013 and never received the annuity benefits he was due, with the claim for such benefits passing to his estate.[47]

71.      The incident with Mr. Toland underscores the human cost of MetLife's failure to timely pay pension benefits to beneficiaries under GACs.  Plaintiffs and members of the proposed Class are seniors whose remaining years of life are limited and whose resources, in many cases, are also very limited.  As acknowledged by MetLife, this problem "goes back 25 years," meaning that some unpaid annuitants were 65 years old twenty-five years ago and, if living, are 90 years old

---

[45] *Estate of William P. Toland, Sr. v. Metropolitan Life Insurance Company and Reed Elsevier, Inc.*, FINRA Dispute Resolution No. 15-03033.

[46] MetLife's excuse for its failure to pay annuity benefits to Mr. Toland was that it did not have a current address at which it could contact him before 2012—despite the fact that Mr. Toland and his family had lived at the same home for over *48 years* and he was still receiving certain other retirement benefits to which he was entitled through his employment with Martindale-Hubbell.

[47] On August 3, 2016, MetLife enjoined the FINRA arbitration arguing, among other things, that the dispute was not subject to mandatory arbitration pursuant to FINRA rules.  Instead, MetLife argued that the delayed processing of annuity payments fell within the scope of ERISA and that the matter should be tried in the United States District Court for the District of Massachusetts.  *See Metropolitan Life Ins. Co. v. Michelle Smith, Executrix of the Estate of William P. Toland Sr.*, No. 1:16-cv-11582 (D. Mass. 2016).  The Court agreed with MetLife and the matter proceeded in the District Court, eventually settling in December 2017 for an undisclosed amount.

today.  Failure to timely pay their annuity benefits and accrued interest has caused them economic

hardship and irreparable harm.

72.     The multi-state investigation, the Philadelphia DOL investigation, MetLife's internal

audits and Pilot Program, and the FINRA arbitration all put MetLife on notice that it had systemic

problems with the monitoring of beneficiaries, including beneficiaries under GACs, and the timely

payment of benefits to those so entitled.  The corporate reforms undertaken by MetLife pursuant to

the 2012 Regulatory Agreement demonstrate that MetLife understood how to address these problems

through business protocols, processes, and procedures.  MetLife's failure to use this knowledge and

expertise to ensure prompt payment of benefits to pension risk transfer beneficiaries is

unconscionable and demonstrates the Company's utter disregard for these retirees who had earned

and are due retirement benefits from MetLife.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

73.     MetLife actively foreclosed Plaintiffs and Class members from discovering its

unlawful conduct.  Plaintiffs and Class members had no way of knowing that MetLife had failed to

pay annuity benefits—and interest and investment proceeds on these funds—until, at the earliest,

MetLife disclosed its misconduct in late 2017.

74.     MetLife's conduct is continuing in nature.  To this day, MetLife continues to conceal

its practices from Plaintiffs and the public alike.  Under the GACs, MetLife is responsible for timely

administering annuity benefits to Plaintiffs and the Class including maintaining current contact

information, communicating with beneficiaries about the existence of and information regarding

their benefits, and calculating the specific amount of benefits due them including interest.  In

addition, the GACs impose a continuing obligation on MetLife to make prompt and full payment of

annuity benefits to Plaintiffs and the Class.  MetLife's continued failure to meet its obligations

represents additional and successive breaches of the GACs.

75.     As a result of the foregoing, Plaintiffs and the Class could not reasonably discover the unlawful and unethical practices described herein and did not do so until recently.  The vast majority of Class members still do not know the extent to which they have been injured by MetLife's conduct.  For these reasons, all applicable statutes of limitations have been equitably tolled with respect to the claims alleged herein.

## VI.    METLIFE IS A FIDUCIARY

76.     MetLife was in a position of trust with the annuitants and beneficiaries as it held funds for their benefit, was responsible for maintaining adequate reserves to pay the benefits due them, and had an obligation to timely notify, communicate with, and pay annuitants and beneficiaries.  MetLife had complete discretion in the methods and means used to contact, notify, and communicate with annuitants and beneficiaries about the existence of and information regarding the annuities as well as the amounts.  Moreover, as one of the world's largest financial services companies, MetLife is in a superior position to individual annuitants such as Plaintiffs and the Class. These facts put MetLife into a fiduciary relationship with the annuitants and beneficiaries.

77.     Despite the special nature of its relationship with the annuitants and beneficiaries and its obligations to them, MetLife took advantage of the retirees' vulnerable position.  For many years, MetLife concealed the existence of annuity benefits from pension risk transfer annuitants.  When it did acknowledge to Plaintiffs and the Class that they were owed annuity benefits, MetLife did so in a way that made it appear that its conduct was lawful.

78.     MetLife assumed and exercised total control over the funds it held in reserve to pay benefits to Plaintiffs and the Class.  MetLife also maintained total discretion and control in the administration of the benefits owed to Plaintiffs and the Class, including the discretion to timely notify Plaintiffs and the Class of the existence of the annuity benefits, the details regarding the

management and distribution of their benefits, and the calculations used to determine the amounts owed to them.

79.     MetLife, therefore, is a fiduciary and owes certain fiduciary obligations to Plaintiffs and the Class.  Among the fiduciary obligations is an obligation to make full disclosure to Plaintiffs and the Class of all pertinent facts relating to the details and administration of their annuity benefits, including the calculations used to determine the amount of benefits due them, and the obligation to make timely payments to Plaintiffs and the Class of the full amount of benefits, including interest, due them.

## VII.    CLASS ALLEGATIONS

80.     <u>Class Definition.</u>  Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2), and (b)(3), as representatives of the following Class:

> *All annuitants and their designated beneficiaries who were due annuity payments pursuant to GACs purchased from MetLife by sponsors of employer-provided defined benefit plans who did not timely receive the entire amount to which they were entitled, including interest and MetLife's earnings on the unpaid benefits.*

Plaintiffs reserve the right to revise the Class definition prior to certification. Excluded from the Class are MetLife and its employees, subsidiaries, and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family.

81.     This action is brought, and may properly be maintained, as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2), and (b)(3).  This action satisfies the numerosity, typicality, adequacy, commonality, superiority and predominance requirements of those provisions.  The members of the Class are readily ascertainable from records maintained by Defendants.

82.     <u>Numerosity.</u>  The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members is

unknown to Plaintiffs at this time, by MetLife's own admission, at least 13,500 beneficiaries have been affected by the Company's misdeeds.  The exact number of Class members and their identities are known by Defendants or are readily ascertainable from the Defendants' records.

83.    Typicality.  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs' claims are based on the same facts, practices, and legal theories as each of the members of the Class.  MetLife failed to provide adequate and timely notice of the annuity benefits due Plaintiffs and all Class members.  Plaintiffs and all Class members were denied the timely payment of the full amount of their overdue annuity benefits and accrued interest.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants in connection with their failure to provide annuity benefits under GACs.

84.    Adequacy.  Plaintiffs will fairly and adequately protect the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.  Plaintiffs have retained counsel that are competent and experienced in complex class action litigation.  Plaintiffs' counsel will undertake to vigorously protect the interests of the Class.

85.    Commonality.  There are questions of law and fact common to the members of the Class.  The claims of all Class members originate from the same misconduct and violations of law perpetrated by Defendants.  The common questions include, but are not limited to:

- Whether claims brought by Plaintiffs and the Class are governed by GACs;

- Whether Defendants violated their contractual obligations to Plaintiffs and the Class;

- Whether Defendants have a special and/or confidential relationship with Plaintiffs and the Class;

- Whether Defendants failed to notify and timely pay the full amount of overdue annuity benefits and accrued interest to Plaintiffs and the Class;

- Whether Defendants were unjustly enriched by their practice of improperly releasing reserves established for payment of annuity benefits owed to Plaintiffs and the Class;

- Whether Defendants converted to their own use and benefit the funds reserved for and that properly belonged to Plaintiffs and the Class;

- The amount, if any, of interest owed to Plaintiffs and the Class as a result of Defendants' failure to make timely payment of benefits;

- The profit or investment returns earned by Defendants from the use of the unpaid or delayed benefits;

- Whether Plaintiffs and the Class are entitled to declaratory, injunctive, or other equitable relief;

- Whether Defendants are liable to Plaintiffs and the Class for disgorgement or other remedies and, if so, in what amount; and

- Whether Defendants are liable to Plaintiffs and the Class for reasonable attorneys' fees and expenses.

86.     <u>Superiority</u>.   Under Fed. R. Civ. P. 23(b)(3), class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would entail.  Furthermore, each Class member's individual claim is smaller than the cost of litigating each individual claim.  Thus, the benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress for claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

87.     <u>Predominance</u>:   Questions of law and fact common to the members of the Class predominate over questions that affect individual Class members because Defendants' conduct affected the entire Class similarly.

88.     This action is also maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

89.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Breach of Contract**

90.    Plaintiffs, on behalf of themselves and the Class, reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

91.    MetLife issued GACs to employee pension plan providers and agreed under the contracts to assume the administration and payment obligations of the pension plans to the beneficiaries of the plans.  The GACs were entered into for the benefit of Plaintiffs and the Class. Accordingly, Plaintiffs and the Class are the intended and foreseeable beneficiaries of the GACs.

92.    Upon information and belief, MetLife uniformly agreed under the GACs to timely contact, notify, and pay the full amount of annuity benefits and accrued interest due to Plaintiffs and the Class.  MetLife also uniformly agreed under the GACs to provide group annuity certificates to Plaintiffs and the Class notifying them that MetLife has assumed responsibility for administering and paying benefits to Plaintiffs and the Class and providing details regarding the benefits owed to them pursuant to the GACs.

93.    MetLife has breached and continues to breach the GACs by failing to notify and make full and timely payments of annuity benefits, including accrued interest, to Plaintiffs and the Class.  MetLife has also breached and continues to breach the GACs by failing to provide group annuity certificates and information about the benefits owed to Plaintiffs and the Class.

94.    As intended third-party beneficiaries of the GACs, Plaintiffs and the Class members have been damaged by MetLife's breach of the GACs in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
**Breach of Implied Covenant of Good Faith and Fair Dealing—Contract**

95.     Plaintiffs, on behalf of themselves and the Class, reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

96.     MetLife issued GACs to employee pension plan providers and agreed under the contracts to assume the administration and payment obligations of the pension plans to the beneficiaries of the plans.  The GACs were entered into for the benefit of Plaintiffs and the Class. Accordingly, Plaintiffs and the Class are the intended third-party beneficiaries of the GACs.

97.     Implicit in every contract is the duty of good faith and fair dealing requiring either party to not act to destroy or injure the right of the other party to receive the benefits of the contract. By entering into the GACs, MetLife implicitly agreed not to undermine the purpose of the GACs and owed to Plaintiffs and the Class the duty to act in good faith to carry out its obligations under the GACs.

98.     MetLife acted unfaithfully to the purpose of the GACs and breached its duty to Plaintiffs and the Class to perform under the GACs in good faith by, *inter alia*, failing to provide group annuity certificates to Plaintiffs and the Class, failing to keep and maintain current contact information for Plaintiffs and the Class, failing to timely notify and provide information to Plaintiffs and the Class about the annuity benefits to which they are entitled, including the relevant GACs and the calculations used to determine the amount of benefits and accrued interest due them, and failing to promptly pay Plaintiffs and the Class the full amount of benefits and accrued interest they are due.

99.     MetLife further breached its duty to Plaintiffs and the Class by failing to establish reasonable protocols, processes, and procedures for identifying, locating, and timely paying the full amount of benefits (and interest) to Plaintiffs and the Class and by releasing the reserves established for the payment of annuity benefits to Plaintiffs and the Class.

100.    MetLife performed in a manner that was unfaithful to the purpose of the GACs, depriving Plaintiffs and the Class of their justified expectation of timely receiving the full amount of annuity benefits (and interest) to which they are due.

101.    Plaintiffs and the Class members have been damaged by MetLife's breach of the duty of good faith and fair dealing implicit in the GACs in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**Breach of Implied Covenant of Good Faith and Fair Dealing—Tort**

102.    Plaintiffs, on behalf of themselves and the Class, reallege and incorporate by reference paragraphs 1 to 89 as though fully set forth herein.

103.    In the absence of a valid and enforceable contract, Plaintiffs and the Class are entitled to recovery of damages for MetLife's tortious breach of the implied covenant of good faith and fair dealing.

104.    Through the pension risk transfer process, MetLife assumed complete responsibility for the administration and payment obligations of the employee pension plan providers to the beneficiaries of the plans.  MetLife stands in an entrusted position and owes Plaintiffs and the Class a duty of good faith and fair dealing to administer and promptly and fully pay annuity benefits and accrued interest to Plaintiffs and the Class.  Moreover, as one of the world's largest financial services companies, MetLife is in a superior position to individual annuitants such as Plaintiffs and the Class and ensuring that MetLife makes prompt and full payment of annuity benefits to pension risk transfer annuitants is in the public interest.

105.    MetLife has complete discretion in the administration of annuity benefits to Plaintiffs and the Class, including the methods and means used to contact and notify Plaintiffs and the Class of the existence and amount of benefits due them, giving rise to a special and/or confidential relationship between MetLife and Plaintiffs and the Class.  This special relationship imposes certain duties upon MetLife.  Plaintiffs and the Class are reliant on MetLife to provide information

regarding their annuity benefits, including the terms of eligibility and the methods used to calculate

the full amount of benefits and accrued interest due them.  Plaintiffs and the Class are also reliant on

MetLife to provide timely and full payment (including interest) of their annuity benefits.

106.    MetLife breached its duty to Plaintiffs and the Class to act in good faith by, *inter alia*,

failing to keep and maintain current contact information for Plaintiffs and the Class, failing to timely

notify Plaintiffs and the Class about the annuity benefits to which they are entitled, failing to provide

information about the benefits owed to Plaintiffs and the Class including information regarding the

calculations used to determine the full amount of benefits (and interest) due them, and failing to

promptly pay Plaintiffs and the Class the full amount of benefits and accrued interest they are due.

107.    MetLife further breached its duty to Plaintiffs and the Class by failing to establish

reasonable protocols, processes, and procedures for identifying, locating, and timely paying the full

amount of benefits (and interest) to Plaintiffs and the Class and by releasing the reserves established

for the payment of annuity benefits to Plaintiffs and the Class.

108.    Plaintiffs and the Class members have been damaged by MetLife's tortious breach of

the implied covenants of good faith and fair dealing in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment

109.    Plaintiffs, on behalf of themselves and the Class, reallege and incorporate by

reference paragraphs 1 to 89 as though fully set forth herein.

110.    In the absence of a valid and enforceable contract, Plaintiffs and the Class are entitled

to recovery of damages under a theory of unjust enrichment.

111.    As set forth above, MetLife has admitted that it wrongfully withheld annuity benefits

from Plaintiffs the Class over the course of 25 years.  MetLife has also admitted that it released

the reserves established for payment of the annuity benefits to Plaintiffs and the Class.  By

eliminating those liabilities from its balance sheet, MetLife enhanced its reported earnings and benefitted thereby.

112.    MetLife earned and continues to earn undisclosed earnings, gains, and investment proceeds on the funds held in its pension reserve accounts established for payment of the annuity benefits to Plaintiffs and the Class and from the wrongful release of these reserves.  MetLife has benefited and continues to benefit from the delay in making payments of the full amount of annuity benefits (and interest) due to Plaintiffs and the Class.

113.    Plaintiffs thereby have conferred a benefit on MetLife and MetLife has benefitted and been unjustly enriched at the expense of the Plaintiffs and the Class.  Equity and good conscience require that MetLife make restitution by disgorging all earnings, profits, and gains MetLife has unjustly obtained or will unjustly obtain in the future at the expense of Plaintiffs and the Class and pay those funds to Plaintiff and the Class.

**FIFTH CAUSE OF ACTION**
**Conversion**

114.    Plaintiffs, on behalf of themselves and the Class, reallege and incorporate by reference paragraphs 1 to 89 as though fully set forth herein.

115.    As set forth above, MetLife has admitted to wrongfully withholding annuity payments from Plaintiffs and the Class over the course of 25 years.  Plaintiffs and the Class are the rightful owners of the funds held by MetLife in its pension reserve accounts to pay annuity benefits and are entitled to possession of the funds.

116.    The possessory interests of Plaintiffs and the Class are superior to any interest MetLife has in the reserves established for payment of the annuity benefits.  By releasing the reserves established for payment of the annuity benefits to Plaintiffs and the Class, MetLife wrongfully exercised dominion and control over the funds to the exclusion of the rights of plaintiff

and the Class and MetLife benefited by eliminating the liabilities from its balance sheet and inflating its financial results.

117.    In doing so, MetLife unlawfully converted the group annuity funds belonging to Plaintiffs and the Class to its own use and benefit over the superior possessory rights of Plaintiffs and the Class.  Plaintiffs and the Class members have been damaged by MetLife's conversion in an amount to be proven at trial.

<u>SIXTH CAUSE OF ACTION</u><br>
<b>Breach of Fiduciary Duty</b>

118.    Plaintiffs, on behalf of themselves and the Class, reallege and incorporate by reference paragraphs 1 to 89 as though fully set forth herein.

119.    MetLife assumed and exercised total control and total discretion in the administration of the benefits owed to Plaintiffs and the Class and was bound to act for the benefit of Plaintiffs and the Class.  Moreover, as one of the world's largest financial services companies, MetLife is in a superior and entrusted position to individuals such as Plaintiffs and the Class.  MetLife, therefore, owes certain fiduciary obligations to Plaintiffs and the Class.

120.    MetLife breached its fiduciary duties by, *inter alia,* failing to timely notify Plaintiffs and the Class of the existence of the annuity benefits, failing to provide information to Plaintiffs and the Class regarding the details of their annuity benefits, including the calculations used to determine the amount of benefits and accrued interest due them, and by failing to make timely payments to Plaintiffs and the Class of the full amount of benefits, including interest, due them.  MetLife also breached its fiduciary duties by failing to establish reasonable protocols, processes, and procedures for identifying, locating, and timely paying the full amount of benefits (and interest) to Plaintiffs and the Class and by releasing the reserves established for the payment of annuity benefits to Plaintiffs and the Class.

121.    Plaintiffs and the Class members have been damaged by MetLife's breach of its fiduciary duties and MetLife should be required to account for and disgorge undisclosed profits and earnings on the funds belonging to Plaintiffs and the Class.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief as follows:

A.    Certifying this action as a Class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs and their counsel to represent the Class;

B.    Actual damages for Defendants' breach of contract including accrued interest;

C.    Awarding compensatory and punitive damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Ordering declaratory, injunctive, and equitable relief as necessary and appropriate, including, *inter alia*, issuing a preliminary injunction prohibiting Defendants from settling claims for unpaid pension benefits in a manner that would require annuitants and beneficiaries to waive any rights, an immediate accounting of all prior payments of benefits under GACs to determine the proper amounts that should have been paid, as well as restitution, disgorgement of profits, or any other remedies in equity;

E.    Ordering an expedited Court-supervised plan to: (i) locate purportedly missing Class members; (ii) provide notice to Class members; and (iii) pay annuity benefits and accrued interest to Class members;

F.    Awarding Plaintiffs' counsel attorneys' fees, reimbursement of out-of-pocket litigation expenses, expert witness fees, and other costs pursuant to the common fund doctrine and/or any other applicable doctrine; and

G.    Awarding such other and further relief as may be just and proper.

## X.    JURY TRIAL DEMANDED

Plaintiffs demand a jury trial of all issues so triable.

DATED:  November 18, 2019

/s/ John P. Aldrich
John P. Aldrich
Nevada Bar No. 6877
**ALDRICH LAW FIRM, LTD.**
7866 West Sahara Avenue
Las Vegas, NV 89117
Tel:  (702) 853-5490
Fax:  (702) 227-1975
jaldrich@johnaldrichlawfirm.com

Norman Berman *(pro hac to be submitted)*
Nathaniel L. Orenstein *(pro hac to be submitted)*
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Tel:    (617) 542-8300
Fax:    (617) 542-1194
nberman@bermantabacco.com
norenstein@bermantabacco.com

*Attorneys for Plaintiffs*